UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEPHANIE HUGHES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 17 C 5468 |
| | ) |
| NANCY A. BERRYHILL, Acting | ) Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stephanie Hughes ("Hughes") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Hughes asks the Court to reverse and remand the ALJ's decision, and the Commissioner seeks an order affirming the decision. For the reasons set forth below, the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

**I. BACKGROUND**

Hughes was born on July 4, 1964 and has a history of shortness of breath, leg and knee pain, and a heart attack in November 2013. Hughes alleges that she became totally disabled on August 1, 2012 due to coronary artery disease, hypertension, gastroesophageal reflux disease, and hyperlipidemia.[1] Hughes has a high school education and previously worked as a babysitter, bagger, cashier, and parent facilitator. Hughes' insured status for DIB purposes expired on September 30, 2014, which means Hughes had to show she was disabled on or before that date in order to be eligible for DIB. *Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir.

---

[1] At the hearing, Hughes testified that she became disabled in November 2013 due to a heart attack. (R. 47).

2012) (noting "the claimant must establish that he was disabled before the expiration of his insured status . . . to be eligible for disability insurance benefits.").

Under the standard five-step analysis used to evaluate disability, the ALJ found that Hughes had not engaged in substantial gainful activity since her alleged onset date of August 1, 2012 (step one) and her coronary artery disease, bilateral knee osteoarthritis, and restless legs syndrome ("RLS") were severe impairments (step two). (R. 15). He determined that Hughes' hypertension, hyperlipidemia, and GERD were non-severe because they did not cause more than a minimal limitation in functioning. (R. 16). The ALJ found that that Hughes' coronary artery disease, bilateral knee osteoarthritis, and RLS did not qualify as a listed impairment (step three). (R. 20-21). The ALJ concluded that Hughes retained the residual functional capacity ("RFC") to perform light work (i.e., "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . [and] a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."), *see* 20 C.F.R. § 404.1567(b); 416.967(b), except that she was limited to work requiring no climbing ladders, ropes, or scaffolds, kneeling, or crawling; occasional climbing of ramps and stairs, balancing, stooping, and crouching; no work in concentrated exposure to extreme cold or extreme heat; and no work around hazards such as unprotected heights and exposed moving mechanical parts. (R. 21).

Given this RFC, the ALJ concluded that Hughes was able to perform her past relevant work as a child monitor as actually performed. (R. 23). As an alternate finding, at step five, the ALJ found that Hughes could perform other jobs that existed in significant numbers in the national economy, such as marker jobs, information clerk jobs, and ticket seller jobs. (R. 24). The Appeals Council denied Hughes' request for review on May 26, 2017. (R. 1-6). Hughes now seeks judicial review of the final administrative decision of the Commissioner, which is the ALJ's decision. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

## II. DISCUSSION

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listing found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a), 416.920(a) (2012); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a) (2012). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (*quoting Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ricardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, an ALJ's credibility determination should be upheld "unless it is patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

The ALJ denied Hughes' claim at step four and alternatively, at step five of the sequential evaluation process, finding that Hughes retains the residual functional capacity to perform her past relevant work as a child monitor as actually performed and a significant number of unskilled light jobs in the national economy. Hughes challenges the ALJ's decision on four grounds: (1) the ALJ erroneously failed to evaluate Hughes' obesity in combination with her other impairments; (2) the ALJ failed to adequately evaluate Hughes' bilateral osteoarthritis of the knees; (3) the ALJ failed to properly evaluate Hughes' RLS; and (4) substantial evidence does not support the ALJ's step-four decision that Hughes can perform her past relevant work as a child monitor as actually performed. The Court finds that the ALJ erred in determining Hughes' RFC by failing to evaluate Hughes' obesity and improperly evaluating her bilateral osteoarthritis of the knees and RLS. Because the ALJ will reevaluate Hughes' RFC on remand, the Court need not address whether the ALJ also erred at steps four and five as those determinations are dependent upon the flawed RFC assessment.

**A.      The ALJ's Failure to Consider Hughes' Obesity**

Hughes contends that the ALJ failed to adequately evaluate her obesity including the aggravating impact that her obesity has on her bilateral knee osteoarthritis and RLS when formulating the RFC. Hughes suggests that her obesity aggravates the symptoms of her bilateral knee osteoarthritis and RLS and limits her ability to stand and/or walk. The Court agrees that the ALJ failed to specifically address Hughes' obesity and offered no analysis of the exacerbating effect of her obesity on her underlying conditions. The ALJ's failure to consider Hughes' obesity along with her other impairments was not harmless error.

"According to SSR 02-1p, an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006); *see also Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (stating "[a]n ALJ must factor in obesity when determining the aggregate impact of [a claimant's] impairments."). That is so because "[t]he combined effects of obesity

4

with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2002 WL 34686281, at *1 (Sept. 12, 2002).

The record demonstrates that Hughes was obese during some of the applicable period. On March 3, 2014, Hughes' Body Mass Index (BMI) was 30.81. (R. 448). A BMI of 30.0 or above is classified as obese. SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002). Hughes is 5'1" tall and her weight during the March 19, 2014 consultative examination with Dr. Velis was 165 pounds, meaning her BMI was 31.2.[2] (R. 19, 433). On November 16, 2015, Hughes had a BMI of 31.366. (R. 800). Her BMI increased to 32.783 on February 1, 2016. (R. 820). When Hughes saw Dr. Goldberg on May 10, 2016, her BMI was 33.444. (R. 842).

Hughes argues that the ALJ failed to address how her obesity affected her knee pain and her ability to stand and/or walk six hours in an eight-hour workday. Hughes' argument has merit. "[U]nder S.S.R. 02-1p the ALJ must specifically address the effect of obesity on a claimant's limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The ALJ barely acknowledged Hughes' weight in his decision. Apart from a reference to Hughes' testimony regarding her height and weight and one incorrect reference to Hughes being "overweight" with a BMI of 33.46, the ALJ did not discuss Hughes' weight. (R. 19, 22).[3] The ALJ did not mention the words "obese" or "obesity" in his decision. Accordingly, the ALJ erred by failing to specifically address the effect of Hughes' obesity when formulating the RFC. *See Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) (finding "[t]he [ALJ] gave meager attention to the plaintiff's obesity . . . . We keep telling . . . [ALJs] that they have to consider an applicant's medical problems in combination.").

---

[2] Dr. Velis reported that Hughes is 5'3" tall without shoes. (R. 433). Hughes points out, and the Commissioner does not dispute, that Dr. Velis' height measurement is an outlier. (Doc. 14 at 7-8 n. 9). The ALJ did not reject Hughes' testimony that she is 5'1" tall (R. 19, 44), and the medical records overwhelmingly show that Hughes is 5'1" tall. (R. 278, 323, 337, 386, 439, 448, 680, 720, 739, 783).
[3] A BMI of 30 or higher is considered "obese," not "overweight."

5

The Commissioner does not dispute that Hughes was obese during the relevant time period and that the ALJ did not recognize that Hughes was obese. The Commissioner appears to suggest that the ALJ implicitly factored Hughes' obesity into the decision as part of the state agency physicians' opinions. (Doc. 19 at 2-3). In some cases, an ALJ's failure to explicitly discuss the impact of obesity may be harmless. "[T]his type of error may be harmless when the RFC is based on limitations identified by doctors who specifically noted obesity as a contributing factor to the exacerbation of other impairments." *Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (noting that "the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.").

The Court rejects the Commissioner's harmless error argument as this case lacks evidence suggesting the ALJ implicitly considered Hughes' obesity. There is no evidence that the state agency physicians were aware of Hughes' obese condition. Neither state agency physician noted Hughes' obesity in their assessments. The consulting physicians' only noted Hughes' self-reported height of 61 inches and weight of 142 pounds, which corresponds to a BMI of 26.8 and placed her in the "overweight" rather than "obese" category on the BMI scale.[4] (R. 73, 79, 87, 98). Also, the ALJ's RFC finding is not based on the state agency physicians' opinions. The ALJ gave Dr. Panepinto's opinion that Hughes' osteoarthrosis, essential hypertension, ischemic heart disease, and hyperlipidemia were not severe "little weight," finding that "the evidence indicates the claimant has severe physical impairments." (R. 22). With respect to Dr. Oh, the ALJ assigned his opinion that Hughes could perform medium exertional work "only little weight" because "the evidence does indicate the claimant is limited to a wide range of light work exertionally." *Id*. Because the reports of the state agency physicians did not

---

[4] A BMI of 25 to 29.9 is classified as "overweight." SSR 02-1p, 2002 WL 34686281, at *2.

6

note Hughes' obesity and the ALJ did not credit those reports, the ALJ's failure to sufficiently consider Hughes' obesity in formulating the RFC was not harmless.

Given that obesity may exacerbate pain and limitations from arthritis affecting weight-bearing joints, the ALJ's failure to address obesity in combination with Hughes' bilateral knee osteoarthritis and knee pain is an error that is potentially dispositive and could alter Hughes' RFC. SSR 02-1p, 2002 WL 34686281, at *1 (Sept. 12, 2002) (recognizing that "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."); *Barnett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (noting "[e]ven if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both."). A remand is warranted on this issue because Hughes' obesity may impact the severity of her other impairments and her functional limitations. On remand, the ALJ shall consider the impact of Hughes' obesity in combination with her other impairments in assessing her RFC, particularly with respect to exertional limitations such as standing and walking.

**B.     The ALJ's Assessment of Hughes' Restless Legs Syndrome**

Hughes' next argument is that the ALJ failed to adequately account for her RLS in the RFC formulation by erroneously rejecting Dr. Goldberg's opinion.[5] On May 10, 2016, Dr. Goldberg examined Hughes at Rush University Medical Center. (R. 588-91). That same day, Dr. Goldberg completed a Physical Medical Source Statement. (R. 558-61). Dr. Goldberg noted diagnoses of coronary artery disease, hypertension, hyperlipidemia, gastroesophageal

---

[5] Restless legs syndrome (RLS) "causes unpleasant or uncomfortable sensations in the legs and an irresistible urge to move them. Symptoms commonly occur in the late afternoon or evening hours, and are often most severe at night when a person is resting, such as sitting or lying in bed." National Institute of Neurological Disorders and Stroke, "Restless Legs Syndrome Fact Sheet," https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Restless-Legs-Syndrome-Fact-Sheet. RLS is "one of several disorders that can cause exhaustion and daytime sleepiness, which can strongly affect mood, concentration, job and school performance." *Id.*

reflux disease, and RLS. (R. 558). He indicated a good prognosis and reported that treatment for RLS had consisted of Gabapentin which failed and Pramipexole. *Id.* He noted that Hughes experienced nightly pain in her legs. (R. 558).

Dr. Goldberg opined that Hughes would be absent from work more than four days per month as a result of her impairments. (R. 561). He indicated that Hughes' impairments are likely to produce "good days" and "bad days." *Id.* Dr. Goldberg further opined that Hughes should elevate her legs with prolonged sitting; she can sit two hours in an eight-hour workday; she can stand and/or walk two hours per workday; she can stand one hour at a time; she required a job that allows her to shift positions at will; and she needed to walk around during an eight-hour workday and take unscheduled breaks. (R. 559-60). According to Dr. Goldberg, Hughes' impairments were reasonably consistent with the symptoms and functional limitations described. (R. 561).

The ALJ found that Hughes' RLS was a severe impairment. (R. 15). The ALJ limited Hughes to "no work around hazards as a result of her restless leg syndrome which interferes with sleep to some degree and would cause some degree of fatigue." (R. 23). The ALJ afforded "little weight" to Dr. Goldberg's opinions regarding Hughes' limitations because they were "not supported by his own examination." (R. 23). "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record." *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017) (*citing Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

The two reasons the ALJ offered for rejecting the opinion of Dr. Goldberg are not supported by substantial evidence. First, the ALJ found that the "physical examination taken by [Dr. Goldberg] was unremarkable and he noted full range of motion in all joints and that the claimant was neurologically normal." (R. 23). The ALJ also noted that "repeated examinations by Dr. Shah [Dr. Goldberg's colleague] showed normal physical examinations." *Id.* Second, the ALJ determined that Dr. Goldberg's opinions were based on Hughes' self-reports. *Id.*

The ALJ's emphasis on normal physical examinations and the lack of any neurological abnormality demonstrates a misunderstanding of RLS. There "is no specific test for RLS," and the ALJ cited no medical authority to the contrary. *See* National Institute of Neurological Disorders and Stroke, "Restless Legs Syndrome Fact Sheet," https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Restless-Legs-Syndrome-Fact-Sheet. The cited normal physical examinations and neurologic exam are therefore not relevant to the severity of Hughes' RLS. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (holding "[s]ince swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced."); *see also Sevier v. Berryhill*, 2017 WL 466546, at *4 (C.D. Cal. Jan. 31, 2017) (finding because "no clinical tests exist for diagnosing restless leg syndrome," "the fact that there were no clinical findings to support restless leg syndrome cannot be a basis for finding plaintiff less credible."); *Coffrey v. Astrue*, 2012 WL 4482047, at *13 (N.D. Cal. Sept 28, 2012) (noting treating physician wrote that he could not provide any "clinical findings" on plaintiff's RLS "because there is no medical test available to confirm RLS directly."). Hughes' normal physical examinations and lack of a neurological abnormality do not undermine Dr. Goldberg's opinions on her functional limitations.

Along these same lines, the ALJ's second reason for discounting Dr. Goldberg's opinion fails. The ALJ stated: "Dr. Goldberg noted in the examination report that 'patient reports disability secondary to her restless leg syndrome.' This indicates that he had assessed these limitations based on the claimant's statements regarding her condition rather than his examination or the extensive medical records showing unremarkable examinations." (R. 23). The ALJ reasoned that Dr. Goldberg's limitations opinion "must be regarded as sympathetic and not supported by the medical evidence of record." *Id*.

The Seventh Circuit has held that "if the treating physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d

9

620, 625 (7th Cir. 2008). The Seventh Circuit has recently noted, however, that it is "illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms" when considering bipolar disorder for which "there isn't 'objective medical evidence' that can support a diagnosis." *Aurand v. Colvin*, 654 Fed.Appx. 831, 837 (7th Cir. 2016). Similarly, it is illogical to reject an examining physician's assessment of RLS based on self-reports when that condition is diagnosed based on subjective symptoms. In diagnosing RLS, "[a] physician will focus largely on the individual's descriptions of symptoms, their triggers and relieving factors, as well as the presence or absence of symptoms throughout the day." National Institute of Neurological Disorders and Stroke, "Restless Legs Syndrome Fact Sheet," https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Restless-Legs-Syndrome-Fact-Sheet. The ALJ's focus on unremarkable physical examinations and dismissal of Dr. Goldberg's opinion due to his reliance on Hughes' self-reports is another reflection of the ALJ's failure to recognize the subjective nature of RLS, which is "diagnosed by a doctor's evaluation" of clinical symptoms. *Id.*

The ALJ's errors with respect to Dr. Goldberg's May 10, 2016 opinion are not harmless. If the ALJ had understood the subjective nature of RLS and properly considered Dr. Goldberg's opinion, the ALJ may have included additional limitations in the RFC. Dr. Goldberg found Hughes would be absent from work more than four days per month, needed to elevate her legs with prolonged sitting, needed to walk around during an eight-hour workday and take unscheduled breaks, and required the option to sit/stand/walk at-will. (R. 559-61). If Dr. Goldberg's opinion as to Hughes' limitations were included in the RFC and in the hypothetical questions posed to the VE, the ALJ's nondisability determination may have changed. (R. 66-70). On remand, the ALJ shall re-evaluate the weight to be afforded Dr. Goldberg's opinion in light of the subjective nature of RLS.

Next, Hughes faults the ALJ for failing to account for the sleepiness side effect of her RLS medication on her on-task time and work pace when determining her RFC. In response,

the Commissioner argues that the ALJ explicitly accounted for Hughes' allegations that her medication caused fatigue by limiting her to no exposure to work hazards. When determining a claimant's RFC, the ALJ must take into account "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption of routine, side effects of medication.)." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). An ALJ is not required to address every piece of evidence or testimony presented, but he must articulate "some legitimate reason for his decision" and provide a "logical bridge" between the evidence and his conclusion. *Clifford v. Apfel*, 227 F.3d at 872.

Hughes testified at the hearing that the new medication for her RLS (Pramipexole) makes her feel "druggy" and "puts [her] to sleep." (R. 52). "I don't' like it, but I take it," Hughes said. *Id.* The ALJ noted Hughes' testimony that her medication for RLS "makes her sleepy." (R. 20). Regarding medication side effects, the ALJ stated:

> At the hearing, she complained that the new medication for restless leg syndrome made her sleepy, but she had earlier told a treating source it only affected her at night and that it kept her from sleeping. If such was the case, the side effect would actually be beneficial for her.

(R. 21-22). The ALJ concluded that Hughes should be "limited to no work around hazards as a result of her restless leg syndrome which interferes with sleep to some degree and would cause some degree of fatigue." (R. 23).

The ALJ did not adequately consider the sleepiness side effect of Hughes' RLS medication. While the ALJ noted that Hughes testified that "the new medication for restless leg syndrome made her sleepy" and also considered that Hughes' RLS interfered with her sleep and caused some daytime fatigue, the ALJ did not provide a legitimate reason for his determination that sleepiness "would actually be beneficial for her" because Hughes reported difficulty sleeping at night. (R. 22-23). The ALJ cited no evidence to support his finding that the sleepiness side effect Hughes described was limited to the nighttime and did not occur during the day. Hughes did not testify that the sleepiness side effect of Pramipexole only affected her

11

at night, and the ALJ has no medical expertise to make such a conclusion. (R. 52). The ALJ's discussion fails to build a logical bridge between Hughes' testimony and his conclusion that the sleepiness side effect of her RLS medication was "actually . . . beneficial" because Hughes reported difficulty sleeping at night. (R. 22). On remand, the ALJ should consider the sleepiness side effect of Hughes' RLS medication on her ability to work, including her ability to maintain on-task time and work pace.

**C.     The ALJ's Consideration of Hughes' Bilateral Knee Osteoarthritis**

Hughes additionally contends that the ALJ failed to adequately account for the severity of her knee impairments in determining her RFC and assessing her credibility. The ALJ identified Hughes' bilateral knee osteoarthritis as a severe impairment at step two and limited her to no climbing of ladders, ropes, or scaffolds, kneeling, or crawling and to only occasional climbing of ramps and stairs, balancing, stooping, and crouching due to her bilateral knee osteoarthritis. (R. 15, 21, 23). The ALJ found that Hughes could perform the walking and/or standing requirements of light work. (R. 21). The ALJ stated that the RFC for "light work takes into account all limitations that would be expected from the claimant's bilateral knee osteoarthritis. As a result of this osteoarthritis, the undersigned has limited the claimant to a light exertional capacity rather than medium." (R. 23).

Hughes argues that the ALJ failed to adequately account for her knee pain and difficulties in standing and/or walking in limiting her to a range of light work. Hughes testified at the hearing that she could stand for 20-30 minutes at a time if she can shift her weight and walk for only a couple of blocks due to knee pain. (R. 55-56). By finding certain postural limitations due to her osteoarthritis, the ALJ accepted that Hughes has some degree of limitation in using her knees. However, the ALJ's RFC did not reduce the walking and standing requirements normally associated with light work (i.e., 6 hours of an 8-hour workday). It is not clear how the ALJ determined that Hughes can stand and walk for six as opposed to five, four, three or two hours in an eight hour day. The ALJ did not explain why the evidence supported certain

postural limitations but still allowed Hughes to stand or walk for six out of eight hours every workday. Moreover, the full range of medium work and light work both require "standing or walking, off and on, for a total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (1983). The ALJ's statement that he limited Hughes to light work rather than medium work as a result of her osteoarthritis is unexplained because light work does not demand less standing and walking than medium work. Thus, the ALJ did not adequately explain how the RFC for light work rather than medium work accounted for Hughes' bilateral knee osteoarthritis. In sum, the ALJ fails to logically explain the basis for his finding that Hughes can stand and/or walk 6 hours of an 8-hour workday or how it accounts for Hughes' severe bilateral knee osteoarthritis.

The Commissioner argues that "the ALJ could reasonably find that standing or walking while carrying up to 50 pounds as required by medium work, is more stressful on the knees than standing or walking while carrying up to only 20 pounds or less, as required by light work." (Doc. 19 at 3). The Commissioner's argument is rejected as an impermissible post-hoc rationalization because the ALJ did not justify his RFC for light work by pointing to the lifting requirement differences between the two exertional levels. *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) (stating "the ALJ did not rely on this rationale in his opinion, so the Commissioner cannot now rely on it."); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (stating "the *Chenery* doctrine [] forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.").

The difference between the standing and walking requirements of light work and sedentary work is potentially dispositive in this case. Dr. Goldberg opined that Hughes was limited to two hours of standing and/or walking in an eight-hour workday. (R. 560). As explained above, the ALJ's RFC assessment, which fails to include Dr. Goldberg's limitations, is not supported by substantial evidence. If the ALJ had properly considered Hughes' knee pain and Dr. Goldberg's opinion in assessing her ability to stand and walk, then it is possible the ALJ

would have found Hughes was limited to less than six hours of standing and/or walking a day. If Hughes were limited to unskilled sedentary work, she would be found disabled under the grids as of her 50th birthday. *See* 20 C.F.R. § 404, Subpt. P. App. 2 § 201.14; § 201.00(g) (providing that "[i]ndividuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have not transferrable skills, a finding of disabled ordinarily obtains."); *Thomas v. Colvin*, 534 Fed.Appx. 546, 550 (7th Cir. 2013) (holding "the grids *mandate* a finding of disability at [the claimant's] 50th birthday if she is limited to sedentary work."). The Commissioner does not dispute that Hughes would be disabled under the grids at her 50th birthday if she is limited to sedentary work. Because the Court is not confident that the ALJ would have reached the same conclusion about Hughes' RFC had he properly accounted for Hughes' knee pain and limitation, the ALJ's errors are not harmless. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that error is harmless only if the court is "convinced that the ALJ will reach the same result" on remand).

Hughes further argues that the ALJ erred in assessing her RFC because he failed to include a limitation on the need to elevate her left leg to hip level during prolonged sitting. At the hearing before the ALJ, Hughes testified that elevating her left leg during prolonged sitting relieved the throbbing pain. (R. 53-55). Dr. Goldberg recommended leg elevation with prolonged sitting. (R. 559). The vocational expert opined that if Hughes had to elevate her legs parallel to the ground, Hughes could not perform work in the national economy. (R. 68).

The ALJ acknowledged Dr. Goldberg's opinion about Hughes' need to elevate her legs with prolonged sitting, but noted that Dr. Goldberg "did not say for how long, how often, or how high." (R. 19). The ALJ gave "little weight" to Dr. Goldberg's opinion that Hughes needed to elevate her legs during prolonged sitting. (R. 23). The ALJ's RFC determination that Hughes did not need to elevate her legs during prolonged sitting thus depends upon whether the weight he assigned to Dr. Goldberg's opinion as an examining source is supported by substantial

14

evidence. As discussed above, the ALJ's decision to give little weight to Dr. Goldberg's opinion is not supported by substantial evidence. Remand is appropriate to reevaluate the weight to be afforded Dr. Goldberg's opinions, including reassessing his opinion that Hughes needs to elevate her legs during prolonged sitting. Additionally, on remand, the ALJ shall re-contact Dr. Goldberg to determine "how long, how often, and how high" Hughes must elevate her legs during the workday. (R. 19); *see Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (noting "[t]he ALJ [ ] has a basic obligation to develop a full and fair record."); *Smith v. Astrue*, 467 Fed.Appx. 507, 511 (7th Cir. 2012) (stating "while the record on this issue [of plaintiff's need for leg elevation] is relatively sparse, to the extent the ALJ needed a fuller record to make her decision, she had a duty to develop it.").

Hughes also asserts that in evaluating her credibility, the ALJ impermissibly "played doctor" when interpreting an x-ray of her knees taken in February 2016. The Commissioner does not respond to this specific argument, and the Court agrees that the ALJ's evaluation of Hughes' x-ray results is flawed because the ALJ impermissibly "played doctor." The Seventh Circuit has held that "an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating "as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Hughes' testimony suggested more severe limitations than reflected in the RFC. Hughes testified at the hearing that she could stand for 20-30 minutes at a time if she can shift her weight, walk for only a couple of blocks due to knee pain, and needed to elevate her left leg with prolonged sitting to stop the throbbing pain in her knee. (R. 54-56). The ALJ found it "significant" that the x-ray of Hughes' knees on February 25, 2016 showed an impression of "only mild" bilateral patellofemoral joint space narrowing suggestive of early degenerative change. (R. 22). The ALJ then based his negative credibility determination in part on the x-ray.

The ALJ stated that the x-ray of Hughes' knees was "not consistent with the claimant's extreme complaints of pain and limitation which included a statement that she had extreme pain after climbing the stairs every morning." *Id*.

Without an expert opinion from a medical source, the ALJ is not qualified to conclude that mild bilateral patellofemoral joint space narrowing is inconsistent with Hughes' complaints of knee pain and limitation. *Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) (holding "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment."); *Dolan v. Colvin*, 2016 WL 6442226, at *4 (N.D. Ill. Nov. 1, 2016) (noting that "MRI report refers in places to 'mild' findings, such as 'mild lumbar canal stenosis' and '[m]ild spondylotic changes,' [but] these are medical terms that are not obvious to a layperson, and thus need interpretation by an expert."). The x-ray "results may corroborate [Hughes'] complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion." *Akin*, 887 F.3d. at 317-18; *see also Israel v. Colvin*, 840 F.3d 432, 440 (7th Cir. 2016) (stating "[b]ecause no physician in the record has opined on whether these results [from two MRIs] are consistent with Israel's claim of disabling pain, and because the reports are replete with technical language that does not lend itself to summary conclusions, we cannot say whether the results support or undermine Israel's claim."). Because the ALJ erred by interpreting the significance of x-ray results himself, a remand is required. On remand, the ALJ shall seek an expert opinion as to whether Hughes' x-ray of her knees reveals abnormalities that would result in the level of functional limitations she alleges. *Israel*, 840 F.3d at 440 (directing "[o]n remand, these [MRI] records should be reviewed by a physician to determine whether they are in fact consistent with Israel's claim of disability.").

**D.      Remaining Issues**

Because a remand is warranted on the above grounds, the Court need not reach the other arguments raised by Hughes. For consideration on remand, however, the Court notes

that the ALJ's analysis is based in part on misstatements of the evidence applicable to Hughes' bilateral knee osteoarthritis and RLS. First, in determining Hughes' RFC, the ALJ stated that at a consultative internal medicine examination on March 19, 2014, Dr. Velis noted "a full range of motion of both knees." (R. 22). This statement is incorrect. Dr. Velis wrote that "[t]here was range of motion pain of both knees" and "[f]lexion [was] limited to 90°. There is full range of motion noted in all other joints." (R. 434).[6] The ALJ also stated that Hughes testified that her RLS "is present only at night and improved with medication." (R. 21). A careful review of Hughes' testimony does not support the ALJ's statement that Hughes stated that she had symptoms of RLS only at night. (R. 49-50). Hughes testified that she has symptoms of RLS during the day as well. *Id.* On remand, the ALJ should correct the misstatements of fact discussed herein and revise any portions of his decision affected thereby.

### III. CONCLUSION

For the reasons and to the extent stated above, the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. The Commissioner's Motion for Summary Judgment [18] is denied. The Clerk is directed to enter judgment in favor of Plaintiff Stephanie Hughes and against Defendant Commissioner of Social Security.

**E N T E R:**

*[signature: Daniel M. Martin]*

**Daniel G. Martin**
**United States Magistrate Judge**

**Dated: August 1, 2018**

---

[6] Earlier in the opinion, the ALJ correctly stated that Dr. Velis noted "range of motion of all joints was normal except for the knees, where flexion was limited to 90°." (R. 17).

17